## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JOSEPH LOCKWOOD                                    CIVIL ACTION

VERSUS

OUR LADY OF THE LAKE                               17-509-SDD-EWD
HOSPITAL, INC.


## <u>RULING</u>

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by Defendant, Our Lady of the Lake Hospital, Inc. ("OLOL"). Plaintiff, Joseph Lockwood ("Plaintiff") has filed an *Opposition*[2] to this motion, to which OLOL filed a *Reply*.[3] For the following reasons, OLOL's motion will be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a deaf individual who communicates in American Sign Language ("ASL").[4] On July 1, 2017, while working in the kitchen of a local eatery, Plaintiff lacerated his thumb and went to the emergency room at OLOL to receive treatment.[5] Upon his arrival at OLOL, through his partner, Plaintiff requested a sign language interpreter;[6] however, Plaintiff claims an interpreter was not provided, and he was advised by OLOL

---

[1] Rec. Doc. No. 44.
[2] Rec. Doc. No. 51.
[3] Rec. Doc. No. 55.
[4] Rec. Doc. No. 1, ¶ 9.
[5] *Id.* at ¶¶ 11, 13.
[6] Rec. Doc. No. 44-5, Lockwood Dep. 44:7-20.
Document Number: 60489

staff that the Video Remote Interpreting ("VRI") machine was not working.[7]    Rather, Plaintiff contends he was forced to try to lip read and communicate through written English.[8]    Plaintiff's mother, who later came to the hospital, was allegedly forced to interpret medical consent forms because OLOL refused to provide auxiliary aids.[9]    Due to OLOL's failure to provide a sign language interpreter, Plaintiff contends he was not adequately advised of his diagnoses, prognoses, medications, or treatment.[10]    Further, Plaintiff claims that, absent effective auxiliary communication aids, he was frustrated confused, anxious, isolated, and afraid,[11] and he was effectively precluded from engaging in an equal opportunity to participate in his healthcare.

Plaintiff filed this lawsuit[12] alleging that OLOL violated his rights under Section 504 of the Rehabilitation Act of 1973 ("RA")[13] and Section 1557 of the Patient Protection and Affordable Care Act ("ACA").[14]    Plaintiff seeks damages, injunctive and declaratory relief, and attorneys' fees and costs.    OLOL now moves for summary judgment on all of Plaintiff's claims.

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[7] *Id.* at 44:22-45:3.

[8] *Id.* at 45:4-11.

[9] Rec. Doc. No. 1, ¶ 20.

[10] *Id.* at ¶ 22.

[11] *Id.* at ¶ 21.

[12] Plaintiff asserted claims under the Americans With Disabilities Act ("ADA") and the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2231, but these claims have been previously dismissed.

[13] 29 U.S.C. § 794.

[14] 42 USC § 18116.

Document Number: 60489

as a matter of law."[15] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[16]  A court must deny the motion for summary judgment if the movant fails to meet this burden.[17]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[18] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[19] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[20]

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[21] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[22]  Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[23]

### B.    Compensatory Damages Unavailable

Following the Fifth Circuit's decision in *Jane Cummings v. Premier Rehab Keller, P.L.L.C.*,[24]  wherein the court held that emotional distress damages were not available

---

[15] Fed. R. Civ. P. 56.
[16] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[17] *Id.*
[18] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[19] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).
[20] *Anderson*, 477 U.S. at 249 (citations omitted).
[21] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[22] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[23] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[24] 948 F.3d 673 (5th Cir. 2020).
Document Number: 60489

under ADA and RA,[25] this Court recently granted partial summary judgment on claims for emotional distress damages in *King v. Our Lady of the Lake Hospital, Inc.*[26] and *Labouliere v. Our Lady of the Lake Foundation.*[27]  However, the Court denied summary judgment, in part, finding that those plaintiffs could recover nominal damages if they proved intentional discrimination on the part of the defendant.  Thus, following *Cummings*, Plaintiff is not entitled to recover any damages other than nominal damages if he carries his burden of proving intentional discrimination.

### C.    Intentional Discrimination

#### 1.   Standard for Intentional Discrimination

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[28]  Regulations promulgated by the Department of Health and Human Services offer additional guidance regarding the statute's prohibition in this context. First, "[a] recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care."[29] Second, "[a] recipient ... that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, **where necessary** to afford such persons an equal opportunity to benefit from the service in

---

[25] *Id.*
[26] --- F. Supp. 3d ---, 2020 WL 1908030 (M.D. La. Apr. 17, 2020).
[27] 2020 WL 1435156 (M.D. La. Mar. 23, 2020).
[28] 29 U.S.C. § 794(a).
[29] 45 C.F.R. § 84.52(c).
Document Number: 60489

question."[30]  These "auxiliary aids may include brailed and taped material, interpreters, and other aids for persons with impaired hearing or vision."[31] "[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."[32]

In *Miraglia v. Board of Supervisors of Louisiana State Museum*, the Fifth Circuit recently addressed the intent requirement in disability discrimination cases, noting that, "[t]hough intent is a necessary element of a damages claim, we have previously declined to adopt a specific standard of intent."[33]  Deciding that it "need not delineate the precise contours in this case," the court referred to its past requirements that a plaintiff prove **something more than deliberate indifference to show intent**.[34]

In *Rosario v. St. Tammany Parish Hospital Service District No. 1*,[35] the Eastern District of Louisiana discussed the Fifth Circuit's guidance for what might constitute intent in these types of cases:

> The Fifth Circuit has repeatedly declined to adopt a specific standard of intent for these statutes. *See Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018); *Perez v. Doctors Hosp. at*

---

[30] 45 C.F.R. § 84.52(d)(1) (emphases added).

[31] 45 C.F.R. § 84.52(d)(3).

[32] 45 C.F.R. § 84.4(b)(2).

[33] 901 F.3d 565, 574 (5th Cir. 2018)(citing *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir.2015) (per curiam) (stating that "[w]e did not define what we meant by intent in *Delano–Pyle*"); *see also Frame*, 657 F.3d at 231 n.71 (expressing no opinion on whether failure to make reasonable accommodations constitutes intentional discrimination).

[34] *Id.* at 575 (emphasis added).

[35] 2019 WL 1766983 at *7 (E.D. La. Apr. 22, 2019)(citing *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 604 (11th Cir. 2015) ("[A] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference." (citing *McCullum*, 768 F.3d at 1147))).

Document Number: 60489

*Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015). But the Fifth Circuit has nonetheless offered some guidelines for what may constitute intent. In *Perez*, the Fifth Circuit noted that intent implies **purposeful action**. 624 F. App'x at 184 ("We conclude that on the present record, there is enough to show a dispute of material fact on whether [defendant] intentionally, i.e., purposefully, discriminated."). In *Miraglia*, the court explained that intent "requires that the defendant at least have **actual notice of a violation**." 901 F.3d at 575. That is, the defendant must have some notice that its actions have caused the plaintiff to experience unlawful discrimination. *Id.* (reversing district court and rendering judgment for defendant when district court failed to make any findings that the defendant had actual notice of a violation). In *Miraglia*, the court also noted that previous Fifth Circuit opinions "seem to have required that a plaintiff prove ... **something more than 'deliberate indifference'** to show intent." 901 F.3d at 575; *see also Delano-Pyle*, 302 F.3d at 575 ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA."). Many other circuits use the deliberate indifference standard. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-63 (3d Cir. 2013) (collecting citations from other circuits that have adopted the deliberate indifference standard). Deliberate indifference requires a showing that "the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (internal quotation marks omitted) (emphasis in original). There must also be some evidence that the defendant made a **"deliberate choice"** not to alleviate the likely harm. *Id.* at 1147-48.[36]

In *Liese v. Indian River County Hosp. Dist.*, the Eleventh Circuit noted that "the task of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive."[37] However, the *Liese* court clarified:

> Nonetheless, **this does not mean that every request for an auxiliary aid that is not granted precludes summary judgment or creates liability under the RA. Thus, for example, as both parties agree, the simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA.** Indeed,

---

[36] *Id.* at *6 (emphasis added).

[37] 701 F.3d 334, 342 (11th Cir. 2012)(citing *e.g.*, *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir.2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."); *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir.1999) (finding that whether a sign language interpreter was required under the RA is a question of fact inappropriate for summary judgment); *Duffy v. Riveland*, 98 F.3d 447, 454–56 (9th Cir.1996) *343 (concluding that whether qualified sign language interpreter was required under the Americans with Disabilities Act of 1990 is a question of fact inappropriate for summary judgment).

Document Number: 60489

construing the regulations in this manner would effectively substitute "demanded" auxiliary aid for "necessary" auxiliary aid. Instead, the proper inquiry is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an equal opportunity to benefit from the hospital's treatment.[38]

The court explained that:

> **Whether a particular aid is effective in affording a patient an equal opportunity to benefit from medical treatment largely depends on context, including, principally, the nature, significance, and complexity of the treatment.** For example, emergency surgery is often a complicated concept to convey to a person who can hear well; the attendant risks, manner of surgery, prognosis, and advantages or disadvantages of immediate or postponed surgery can only complicate this communicative task. Thus, under circumstances in which a patient must decide whether to undergo immediate surgery involving the removal of an organ under a general anesthetic, understanding the necessity, risks, and procedures surrounding the surgery is paramount. Under these circumstances, auxiliary aids limited to written notes, body gestures, and lipreading may be ineffective in ensuring that a hearing-impaired patient receives equal opportunity to benefit from the treatment.[39]

Thus, the Eleventh Circuit draws a distinction in the necessity of the type of accommodation depending on the nature of the medical circumstances.

With this guidance in mind, the Court turns to the summary judgment evidence submitted in this matter.

2. <u>Summary Judgment Arguments and Evidence</u>

OLOL contends the summary judgment evidence demonstrates that Plaintiff was offered appropriate auxiliary aids, but his partner Tim Harris ("Harris"), who accompanied him to OLOL on the date of the incident, flatly rejected them. OLOL cites chart notes from nurse Cayla Crosby ("Crosby") who treated Plaintiff in the ER, wherein Crosby details that Plaintiff's partner was "belligerent," and refused to go forward with anything other than an

---

[38] *Id.* at 343 (emphasis added).
[39] *Id.* (emphasis added).
Document Number: 60489

ASL interpreter.[40]  Crosby later confirmed these notes in her deposition wherein she testified that Plaintiff's partner was aggressive and that he refused video interpreting services available.[41]  Despite the interference by Plaintiff's partner in Plaintiff's treatment, OLOL maintains that Plaintiff was examined and treated within approximately 15 minutes and discharged within an hour of his arrival.[42]

Thus, OLOL contends that the summary judgment evidence demonstrates that it attempted to make a reasonable accommodation to Plaintiff to ensure effective communication, but Plaintiff, through his partner, refused such accommodation. Moreover, OLOL maintains that the law does not require that OLOL provide an ASL interpreter upon demand, and OLOL argues that use of the VRI would have provided a more expedient method for triage and evaluation of Plaintiff's medical emergency.  Thus, Plaintiff cannot prove that OLOL intentionally discriminated against him based on his disability.

Plaintiff opposes OLOL's motion and argues there are material facts in dispute which preclude summary judgment.  Plaintiff relies entirely on his own deposition testimony and excerpts of deposition testimony of his mother and one of the nurses who treated him on July 1, 2017.  Plaintiff testified that, after cutting his thumb at work, he texted his boyfriend (Harris) to meet him at the emergency room at OLOL, and they arrived at the emergency room at "pretty much at the same time."[43]  Plaintiff testified that he asked Harris to "[p]lease tell them to call for an interpreter," but the people at in-take

---

[40] Rec. Doc. No. 44-3.
[41] Rec. Doc. No. 44-4, Depo of Crosby at 28.
[42] *Id.* at 30.
[43] Rec. Doc. No. 44-5, Plaintiff's Dep. 44:1.
Document Number: 60489

responded "I don't know how." Plaintiff does not indicate whether Harris communicated this to him, or he observed it himself. Plaintiff testified that he cannot hear at all and does not read lips.[44] When Plaintiff was brought back to check his vitals, he repeatedly communicated that he needed an interpreter, and they "[w]ouldn't allow an interpreter. They were refusing an interpreter."[45] Plaintiff also testified that the hospital attempted to provide him with VRI, but "it was not working;"[46] "I'm not sure whether the VRI device was down or broken or not, because they never brought it to me."[47]

Despite testifying that "Tim is not an interpreter and my mother refused to interpret as well," Plaintiff then testified about what the doctor told him regarding the treatment of his thumb.[48] Plaintiff acknowledged that Harris' conduct caused the staff to bring in security: "I mean, it was quite the ordeal. I got into an argument. It got so loud that they called security and they told Tim that he was getting too loud and not following the rules. Police or security came over and kind of watched to see what was going on."[49] Plaintiff further testified that the communication between Harris and OLOL staff was "loud," and he told Harris "don't do that."[50]

Regarding the initial request for an interpreter, Plaintiff testified that he "signed to Tim, Tim made the request to the woman at the front desk and she looked at me like she had never heard of that."[51] When asked to describe this woman, Plaintiff responded that

---

[44] *Id.* at 44:4-6; 47:7-8: "They thought that I was going to lip read, but I don't lip read."
[45] *Id.* at 44:21-22.
[46] *Id.* at 44:24-25.
[47] *Id.* at 46:3-5.
[48] *Id.* at 46:11-12. Plaintiff states again that, while he was being given discharge instructions, his mother "refused to interpret." *Id.* at 55:11-12. This contradicts his mother's testimony, discussed *infra*.
[49] *Id.* at 47:8-13.
[50] *Id.* at 56:20-21.
[51] *Id.* at 47:25 – 48:1-2.
Document Number: 60489

he could not remember if the person was male or female, black or white, or any other description.[52]   Plaintiff acknowledged that he was in the waiting room approximately four minutes, and hospital staff quickly took him back for vitals.[53]

Although Plaintiff testified that the nurse checking his vitals did not bring a VRI machine to the room and said, "I think it's broken," he qualified this statement:

> Q.   How do you know she said that they thought it was broken?
> A.   I'm not sure. I'm not sure if it was broken. I don't know if it was broken if that's truthful or not.
> Q.   You don't know what the nurse actually said, do you?
> A.   No.
> Q.   You relied on Tim to tell you what somebody said?
> A.   The nurse was using really large words, things that I didn't understand. Thing that I wouldn't have understood in English. I didn't know what they were saying.
> Q.   That's what I'm trying to understand and make clear. You don't know what Tim said and you don't know what the nurse said, correct?
>
> * * *
>
> Q.   You didn't hear Tim, so you don't know what Tim actually said, do you?
> A.   Tim is not a professional interpreter.
> Q.   That's not what I asked. You do not know what Tim said to the nurse?
> A.   I didn't understand Tim's voice, no.
> Q.   You don't know what the nurse said to Tim?
> A.   No.[54]

When asked whether he knew if Harris was offered a VRI and refused, Plaintiff responded: "Honestly, no.· But what I did was I told Tim they need to bring the interpreter in the computer and he understood and he told them and then they said it's broken or it's not working or for some other reason. But, frankly, I don't know. I don't know if it's the truth or not."[55]

---

[52] *Id.* at 48:3-10.
[53] *Id.* at 49:19-23.
[54] *Id.* at 49:8-24 – 50:6-14.
[55] *Id.* at 54:4-9.
Document Number: 60489

When asked why Plaintiff did not use his cellphone to call the service that would interpret for him, he responded that he did not attempt this because "the internet service is terrible. It wouldn't even work.  You had to have a real interpreter in person."[56]  When asked how often Plaintiff had tested the hospital's cellular service, Plaintiff responded: "I just looked at my phone.  I didn't do anything with it.  I was just mad that there was no interpreter.  I just looked at it, but I never did anything with it."[57]

Plaintiff also testified repeatedly that the OLOL staff wanted him to read their lips. When pressed on how he concluded this, Plaintiff admitted that Harris never told him the staff wanted Plaintiff to read their lips; rather, Plaintiff assumed this because the staff looked at him and "they were moving their lips."[58]

When asked if Plaintiff ever requested materials to write messages, he responded: "No, I refused.  I needed an interpreter there in person, period."[59]  When asked if he would have refused to use the VRI, Plaintiff responded:  "No, no, I never said that. … And then that nurse said that the VRI was not working.  I don't know if it was true. I don't know if they made that up.  I have no way to know."[60]  When Plaintiff stated again that the nurse said that the VRI was not working, he agreed that Harris told him the nurse said that.[61] Plaintiff acknowledged that, without Harris, he did not understand anything anyone said at the hospital.[62]

---

[56] *Id.* at 57:21-25.
[57] *Id.* at 58:6-9.
[58] *Id.* at 59:17-18; 60:17.
[59] *Id.* at 60:25 - 11-12
[60] *Id.* at 61:21-25 – 62:1-2.
[61] *Id.* at 63:4-7.
[62] *Id.* at 64:6-8.
Document Number: 60489

Plaintiff testified that "there's just no excuse to not have an interpreter,"[63] and that deaf individuals "require an interpreter.  So we ask them to get an interpreter – call an interpreter and they just refused.  It's not right.  And that's why I'm suing the hospital."[64]

The deposition testimony of intake nurse Crosby, presented by OLOL, paints a somewhat different picture.   Crosby testified that the policy at OLOL is to provide deaf patients with VRI, and OLOL does have a call-out service for ASL interpreters, when necessary.[65]  Crosby explained that "call-out" means that an interpreter may not be available on-site at all times and often must be requested to come to the hospital.[66]  Crosby testified that the auxiliary aid routinely offered by OLOL at the time of Plaintiff's injury was "Deaf TV."[67]  Crosby also testified that patients may use their family members and friends to communicate with hospital staff, but they are not required to do so.[68]  Additionally, Crosby indicated that the complexity of the case would inform her decision regarding the necessity of an in-person translator.[69]  Crosby testified that she was educated upon her hiring at OLOL regarding its policy for accommodating deaf patients, and there is signage posted in the hospital advising patients of their rights under the OLOL policy.[70]

Crosby recalled the night she encountered Plaintiff and Harris in the ER.  When Crosby called Plaintiff back to triage from the waiting room, Harris approached her "very aggressive[ly]," advised her that Plaintiff was deaf, and advised that "he would not speak

---

[63] *Id.* at 70:24-25.
[64] *Id.* at 71:5-8.
[65] Rec. Doc. No. 44-4, Crosby Dep. at 14:3-5.
[66] *Id.* at 14:8-13.
[67] *Id.* at 15:16.
[68] *Id.* at 16:9-13.
[69] *Id.* at 16:15-23.
[70] *Id.* at 17:9-25; 18:1-4.
Document Number: 60489

to [her] until there was a live interpreter present."[71]  Crosby initially attempted to speak to Plaintiff, but Harris was "adamant that neither of them were speaking to me or communicating with me until there was a live translator, a live interpreter."[72]  Crosby explained the process for requesting a live interpreter:

> I explained to him that we have twenty-four hours a day, seven days a week that we have a video service available. I explained to him that was readily available and that we could use that at that time. He refused it and said that he would not communicate with us until there was a live interpreter there. I explained to him that we do have a service that we use, but that it's a call-out service. So I had no way of knowing how long it would take to get an interpreter there in person. My charge nurse was notified. And it was explained to him that if needed we would call the interpreter service. But he refused the TV service that we had.[73]

Crosby informed the charge nurse that Plaintiff was requesting an in-person translator; however, she did not know if anyone was called out given that Plaintiff was "dispositioned and discharged so quickly."[74] Crosby explained that "dispositioned" meant that "the mid-level provider and the supervising doctor assessed [Plaintiff's] injuries and his complaints and decided on his disposition, which was to be discharged home."[75] Crosby acknowledged that, if Plaintiff had needed extensive treatment or had been admitted, "it would have probably been completely different."  But his length of stay was less than an hour, so."[76]

---

[71] *Id.* at 28:7-16.
[72] *Id.* at 29:1-6.
[73] *Id.* at 29:9-23.
[74] *Id.* at 30:3-14.
[75] *Id.* at 30:15-20.
[76] *Id.* at 30:21-24.  Crosby acknowledged that OLOL policy requires an interpreter "if necessary," and she stated that staff "should be able to use the VRI" unless there is a technical issue with the VRI or they are otherwise unable to effectively communicate with a patient.  She further testified that the policy also says that an interpreter will be called out in "more complex cases," and noted that Plaintiff was discharged in less than thirty minutes. *Id.* at 41:1-15.
Document Number: 60489

During the encounter, Crosby found Plaintiff to be calm but could not say cooperative in providing her any information because Harris "was very aggressive and was preventing that from happening."[77]  Crosby testified that she offered the use of Deaf TV "at least twice during triage and both times [Harris] refused it."[78]  Crosby also attempted to communicate with Plaintiff directly by looking at him and speaking to him directly, but these attempts were thwarted by Harris in that he "adamantly refused to communicate with me at all without a live, in-person interpreter present."[79]  Based on this interaction, Crosby admitted that she never brought the Deaf TV into Plaintiff's triage room.[80]

Crosby testified that she had to have the charge nurse escort Plaintiff and Harris from the triage room to an exam room because "Harris refused to leave the triage room."[81]  Crosby estimated that Plaintiff was in triage for approximately ten minutes.[82]  Crosby related that Harris later came back into the triage room while Crosby was triaging another patient: "He came in unannounced without knocking while I was examining another patient and asked me for my name."[83]

Crosby further testified that, during the entire encounter, Harris and Plaintiff were signing "the entire time," but she did not know what Harris communicated to Plaintiff because she does not know ASL.[84]  Crosby was aware that Plaintiff's mother arrived later,

---

[77] *Id.* at 31:1-6.
[78] *Id.* at 31:11-16.
[79] *Id.* at 32:5-19.
[80] *Id.* at 32:20-25.
[81] *Id.* at 33:3-6.
[82] *Id.* at 33:6-7.
[83] *Id.* at 33:20-23.
[84] *Id.* at 34:3-8.
Document Number: 60489

but Crosby had no interaction with Plaintiff's mother.[85]  Crosby confirmed that she was unable to obtain Plaintiff's medical history during triage because Harris "adamantly refused the translation services that we had available at the time."[86]  Crosby testified that she never advised Harris that the VRI was not working, and she offered it on "two separate occasions in the triage room alone."[87]

Crosby was able to obtain Plaintiff's vitals during triage.    Although she acknowledged that she was unaware whether Plaintiff could read lips, she testified that she attempted to ask Plaintiff directly if he wanted to use the VRI, and he responded to her by shaking his head.   Crosby, admittedly unable to interpret whether Plaintiff understood this communication, testified that she believed his negative response to be an indication that he understood what she had offered.[88]   Crosby had no further interaction with Plaintiff or Harris once they were taken to an exam room.[89]

Crosby was asked if Plaintiff ever made any efforts to supersede Harris in attempts to communicate with her or request VRI; Crosby responded that he did not.  In terms of Harris' interference with Crosby's ability to obtain information from Plaintiff, she testified that Harris "was aggressive from the beginning, very belligerent from the beginning.  He, before we even stepped into the triage room, said, I have it charted, said that he is not going to go through this computer crap again and he wanted to  -- he was not speaking to me until there was a live interpreter."[90]  Crosby summarized her encounter with Plaintiff

---

[85] *Id.* at 34:20-23.
[86] *Id.* at 35:1-3.
[87] *Id.* at 35:4-8.
[88] *Id.* at 38:13-25; 39:1-10.
[89] *Id.* at 39:19-21.
[90] *Id.* at 49:19-25; 50:1-2.
Document Number: 60489

and Harris as follows:

> [Harris] adamantly refused it from the very beginning.  Before I even offered it to him, he said that they were not speaking to me until there was a live interpreter. He referred to the VRI as quote/unquote computer crap.
>
> And then when he came into the room it again was offered to him.  I explained we have translator services, but they are call out. I asked again could we use the VRI at that time until we figured out whether we would need to call a translator service or how long it would take for a translator service to get there.  He refused it again.
>
> I offered it to Mr. Lockwood directly at that time.  I asked him if he would be willing to use it.  This was multiple times during this interaction.  He said at that time that I looked him, spoke to him directly, asked him if he would be willing to use the VRI or Deaf Talk TV he said no, or did not say anything, but shook his head no.  And then that was when I said that it would be difficult for me to triage him based on the fact that they – I was unable to communicate with him at that time.
>
> So I called my charge nurse and I told her the situation.  And then that was when we decided to put him in a treatment room, and we would triage him from that point.  I got vitals on him and I put that note in, but I actually didn't triage him because I wasn't able to get any information from him or his partner.[91]

Following Plaintiff's triage, Crosby testified that Plaintiff was seen in an exam room by Charge Nurse Alaina Saltamacchia.[92]

To contrast Crosby's testimony, Plaintiff offers excerpts of the depositions of his mother, Carole Montgomery ("Montgomery"), and the primary nurse handling Plaintiff's treatment on the night in question, Shakita Anderson, RN ("Anderson").   Plaintiff submitted four disjointed pages from Montgomery's deposition.[93]  Montgomery testified that she walked into Plaintiff's intake room on July 2, 2017 "to make sure an interpreter

---

[91] *Id.* at 50:10-25; 51:1-16.
[92] *Id.* at 51:17-21.
[93] Rec. Doc. No. 51-3, Montgomery Dep., pp. 7-8, 23, & 44.
Document Number: 60489

was present, and there was no interpreter."[94]   Montgomery claims this unidentified nurse advised her that she was not needed and slammed the door in Montgomery's face.[95] Montgomery further testified that she observed an unplugged VRI in the room and asked if that had been used for her son, to which she claims the nurse responded "we don't need that."[96]  When Montgomery asked this same, unidentified nurse why no interpreter was there, she testified that the nurse responded:   "we don't use interpreters."[97] Montgomery also testified this nurse said that the VRI machine was not working at the time.[98]   Contrary to Plaintiff's deposition testimony *supra*, Montgomery testified that she interpreted certain information regarding Plaintiff's medical history to the nurse in the exam room because her demand for a live interpreter was refused.[99]

Anderson testified that, as the primary nurse on Plaintiff's case, it was her responsibility to assess his injury, implement a plan of care, and administer necessary medication – anything pertaining to his treatment.[100]   In the three pages of proffered deposition testimony, Anderson essentially testified that she did not remember much about the treatment and discharge of Plaintiff.[101]   Anderson acknowledged that there was no notation in Plaintiff's chart that he requested an in-person interpreter at the time of treatment and discharge but stated that "if I offered it, that would be something I would chart."[102]

---

[94] *Id.* at 7:12-13.
[95] *Id.* at 7:19-25.
[96] *Id.* at 8:3-7.
[97] *Id.* at 8:7-8.
[98] *Id.* at 8:9-10.
[99] *Id.* at 44:4-16.
[100] Rec. Doc. No. 51-2, Anderson Dep. at 25:24-25; 26:1-2.
[101] *Id.* at 26:25; 27:1-11.
[102] *Id.* at 27:12-19.

Document Number: 60489

3.  Analysis

Plaintiff claims his case is analogous to *Perez v. Doctor's Hosp. at Renaissance, Ltd.*[103] and *Delano–Pyle v. Victoria Cty., Tex.*[104]  In *Perez*, the plaintiffs were the parents of an infant who was diagnosed with a brain tumor, which required numerous hospital visits over a four-and-a-half-year period.[105]  The plaintiffs were both deaf individuals who relied on ASL to communicate.[106]  At summary judgment, they presented evidence that the defendant hospital "repeatedly failed to provide them an interpreter" on 18 occasions over this period.[107] One plaintiff testified that sometimes the "nurses would say no" when an interpreter was requested.[108] When an interpreter was provided, the plaintiffs testified they would sometimes have to wait "upwards of a full day" for the interpreter to arrive.[109] The defendant occasionally attempted to use VRI to communicate with the plaintiffs, but plaintiffs presented evidence that the VRI did not always function properly.[110]

In *Delano-Pyle*, a police officer responded to a car accident and found the plaintiff, who communicated to the officer that he was severely hearing-impaired.[111]  The officer administered three sobriety tests to the plaintiff without inquiring about effective forms of communication.[112]  When the plaintiff failed these tests, the officer Mirandized him.[113] The plaintiff was taken to the police station where his legal rights were again read to him,

---

[103] 624 Fed.Appx. 180 (5th Cir. 2015).
[104] 302 F.3d 567 (5th Cir. 2002).
[105] *Perez*, 624 Fed. Appx. at 182.
[106] *Id.*
[107] *Id.* at 185.
[108] *Id.*
[109] *Id.* at 182.
[110] *Id.*
[111] *Delano-Pyle*, 302 F.3d at 570.
[112] *Id.*
[113] *Id.* at 571.
Document Number: 60489

and the officer wrote Miranda warnings on a blackboard.[114]  Despite having full knowledge that the plaintiff was deaf, the officer proceeded to interrogate the plaintiff "without any accommodations to ensure that [the plaintiff] understood the circumstances of his arrest."[115]  The Fifth Circuit upheld a jury's verdict in favor of the plaintiff because the officer had knowledge of the plaintiff's impairment, admitted that he was unsure whether the plaintiff understood him both during the sobriety test or when he verbally communicated his legal rights but failed to provide any accommodation to assist the plaintiff in understanding what was happening.[116]

The Court sees little resemblance in the facts of this case and those in *Perez* and *Delano-Pyle*.  Rather, the Court finds the following cases, wherein other district courts have granted summary judgment, to be more analogous to the facts presented herein.

In *Rosario*, mentioned *supra*, the district court for the Eastern District of Louisiana determined that a hospital was not deliberately indifferent to a deaf plaintiff for failing to provide a live interpreter.  The deaf and mute plaintiff, who was 32 weeks pregnant, was sent to the emergency room after presenting at a routine check-up with very high blood pressure.[117]  When the plaintiff arrived at the ER, she gave a written note to hospital staff requesting an interpreter.[118] Consistent with hospital policy, the treating nurse provided the plaintiff with an iPad to communicate with the plaintiff through VRI.[119]  However, the VRI communications did not go smoothly:  it would often disconnect from the WiFi; the

---

[114] *Id.*
[115] *Id.*
[116] *Id.* at 575-76.
[117] 2019 WL 1766983 at *1.
[118] *Id.*
[119] *Id.* at *2.
Document Number: 60489

picture would freeze or become pixelated; or the picture would disappear altogether.[120] This was the first time the plaintiff had ever used VRI to communicate.[121]  The plaintiff's partner and father of her children accompanied the plaintiff and witnessed the technical difficulties with the VRI that caused the plaintiff to become mad and frustrated owing to her inability to understand.[122]  Following this interaction, the plaintiff again requested a live interpreter and allegedly provided the nurse with the name of an interpreter the plaintiff had previously used.  Although the nurse disputed this, she claimed that she left the room and called for ASL interpreter services but was ultimately unsuccessful in obtaining someone.[123]  The nurse apologized to the plaintiff, advised that a live interpreter was unavailable, and continued to communicate with the plaintiff via VRI.[124]

The plaintiff subsequently had an ultrasound and was given discharge instructions, all via VRI, which occasionally worked.[125]  Although the VRI worked during the discharge instructions, the plaintiff maintained that she did not understand the big words being used or what medications she should take.[126]  When the plaintiff returned home, she was not compliant with medications because she did not fully understand the accompanying instructions.[127]  Although the plaintiff later delivered a healthy baby with the assistance of a live interpreter, she filed suit against the hospital for the ER incident, claiming her rights under the ADA, RA, and ACA were violated in that the hospital discriminated against her on the basis of her disability by refusing to provide her with auxiliary aids and services

---

[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.* at *3.
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*

Document Number: 60489

necessary to ensure effective communication.[128]    The hospital moved for summary judgment.

The *Rosario* court found that the plaintiff had failed to present evidence of intentional discrimination:  "Even when applying the deliberate indifference standard of intent—which the Fifth Circuit has indicated is a lower threshold than the standard that governs this Court, *Miraglia*, 901 F.3d at 575—the facts plaintiff has presented are insufficient to preclude summary judgment."[129]  The court rejected the argument that the hospital was required to provide a live interpreter on demand:  "Defendant's initial unwillingness to secure an on-site interpreter, and Reitz's initial reliance on the VRI and written communication, is not alone evidence of deliberate indifference."[130] Noting that applicable "[r]egulations promulgated to implement the ADA's provisions state that appropriate auxiliary aids and services for the hearing impaired include '[q]ualified interpreters on-site or through video remote interpreting (VRI) services,'"[131] the court determined that the nurse's "initial use of the VRI and written communication instead of securing an on-site interpreter was also consistent with defendant's policies."[132]  The court continued:

> When the VRI began to malfunction, plaintiff became visibly frustrated by the quality of the VRI and reiterated her request for an on-site interpreter. Reitz did not ignore plaintiff's request. Indeed, plaintiff does not dispute that Reitz left the room and called the Northshore DAC. The hospital's phone records confirm that Reitz placed this call. Reitz testified that a representative from the Northshore DAC told her that no one was available

---

[128] *Id.* at *4.
[129] *Id.* at *
[130] *Id.* at *7 (citing *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 604 (11th Cir. 2015) ("[A] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference." (citing *McCullum*, 768 F.3d at 1147))).
[131] *Id.* (quoting 28 C.F.R. §§ 35.104(1), 35.160(b)(1)).
[132] *Id.*

to come to the hospital on such short notice. Plaintiff has not presented any facts that dispute Reitz's testimony about this phone call.[133]

The court concluded that, since the nurse attempted to contact a live interpreter, "[i]t was at worst negligent or careless of Reitz not to call the second organization listed," and "[n]egligence is not evidence of deliberate indifference or intentional discrimination."[134]

Important in the *Rosario* court's analysis was the serious nature of the plaintiff's medical condition when she presented to the ER.  The plaintiff agreed with the defendant that her medical situation was very serious given the late stage of her pregnancy.[135]  The court reasoned:

> Making additional calls to ASL service providers, after she had been informed by one organization that an interpreter was not available on such short notice, would have delayed plaintiff's treatment in an emergency situation. Thus, even when drawing all inferences in plaintiff's favor, Reitz's decision to not make these additional calls was a reasonable decision under the circumstances. Her behavior is certainly not evidence of intentional discrimination.[136]

The court also rejected the plaintiff's claims of discrimination regarding her discharge instructions.  Although the plaintiff later testified that she did not understand the VRI interpreter based on the big words being used during discharge instructions, the court found that found that there was "no indication in the record that plaintiff made it known"

---

[133] *Id.*
[134] *Id.* at *8 (citing *Saltzman v. Bd. of Comm'rs of N. Broward Hosp. Dist.*, 239 F. App'x 484, 488 (11th Cir. 2007)( (noting that although the hospital staff's attempt to secure an on-site interpreter "may have been negligently made, negligence is not intentional discrimination"); *see also Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388 (5th Cir. 2000) (in the context of a Section 1983 claim, noting that deputy sheriff's "failure to abide by" certain policies "evinces at best[ ] negligence ... which is insufficient to support a finding of deliberate indifference")).
[135] *Id.* at *8.
[136] *Id.*

Document Number: 60489

to the nurse that she was unable to understand the VRI communications.[137]   The court

stated:

> Before intent can be imputed on a defendant, the defendant "must have
> notice of a violation." *Miraglia*, 901 F.3d at 575 (defendant did not
> intentionally discriminate by not providing adequate wheelchair-accessible
> ramps at its entrance when there was no evidence the defendant had notice
> the ramps were not ADA-compliant). Because there is no evidence that
> plaintiff notified anyone at discharge that the accommodation the hospital
> provided her was ineffective, no reasonable juror could find that Reitz
> intentionally discriminated against plaintiff at discharge. *Id.*; *McCullum*, 768
> F.3d at 1148 (no finding of deliberate indifference when there was "no
> evidence to support a conclusion that [defendant's] staff knew that their
> accommodations were ineffective").[138]

Like the present Plaintiff, the *Rosario* plaintiff also likened the facts of her case to

those in *Perez* and *Delano-Pyle*.   The court easily distinguished these cases from the

plaintiff's:

> Unlike *Perez*, this is not a case where a defendant's repeated failure to
> properly accommodate the plaintiff over an extended period of time allows
> for an inference of intentional discrimination. Rather, plaintiff's case is
> limited to her experience on one emergency visit that lasted approximately
> three hours. During that emergency visit, the hospital first provided plaintiff
> with an interpreter through VRI, and then attempted to secure an on-site
> interpreter when the nurse was notified that the VRI was malfunctioning.
> Plaintiff admits that she was able to effectively communicate with
> defendant's staff during her subsequent visit. *Perez* is thus entirely
> inapposite.
>
> * * *
>
> Unlike the officer in *Delano-Pyle*, defendant did attempt to accommodate
> plaintiff's disability. Reitz first provided plaintiff with an interpreter through
> VRI, and then attempted to secure an on-site interpreter when the VRI
> malfunctioned. As already addressed, that the VRI initially malfunctioned,
> and that Reitz was—at worst—negligent in attempting to secure an on-site
> interpreter, is not enough to support an inference that Reitz was deliberately
> indifferent to plaintiff's needs. This is especially true considering the nature
> of plaintiff's emergency visit to the hospital. Because the evidence before
> the Court is not even enough to show that defendant was deliberately
> indifferent, it is not enough to establish intentional discrimination in the Fifth

---

[137] *Id.*
[138] *Id.*

Circuit. *Miraglia*, 901 F.3d at 575 (noting that the Fifth Circuit has previously required "something more than 'deliberate indifference' to show intent").

The same analysis distinguishing Rosario's case from *Perez* and *Delano-Pyle* is equally applicable in the present case.

While not binding on the Court, the Court also finds the facts of this case similar to those in *Juech v. Children's Hospital and Health System, Inc.*,[139] particularly with respect to the *Juech* court's analysis of the plaintiff's evidence. In *Juech*, in 2015, the deaf plaintiff took her infant to the emergency room of the defendant hospital and asked the hospital to provide a live ASL interpreter.[140] The plaintiff had been to this hospital approximately 10 times previously and had requested an interpreter on each visit.[141] Although the hospital's general policy is to provide an interpreter when requested, if an interpreter is unavailable, the hospital provides VRI.[142] In admitting the plaintiff's son, VRI was used, and the plaintiff complained that the hospital staff did not know how to set up or use the VRI.[143] Further, the plaintiff complained that there were several technical difficulties with the VRI during their stay before an in-person interpreter later arrived.[144] The plaintiff's infant was placed in the intensive care unit and was discharged three days later. While in the ICU, the plaintiff complained that she had to communicate several times by messages typed on a phone or handwritten notes. An interpreter was present for discharge.[145]

---

[139] 353 F.Supp.3d 772 (E.D. Wisc. 2018).
[140] *Id.* at 774.
[141] *Id.*
[142] *Id.* at 775.
[143] *Id.*
[144] *Id.*
[145] *Id.*

Document Number: 60489

Two years later in 2017, the plaintiff returned to the hospital with another infant child, and she was provided a VRI interpreter.  The plaintiff requested an in-person interpreter for the following day, advising the staff that the VRI did not work for her, and an in-person interpreter was provided upon her child's discharge.[146]

The plaintiff sued the hospital for violations of the ADA, RA, and ACA, alleging the hospital failed to provide her with auxiliary aids and services required to enable effective communication during the hospitalization of her two children.[147]  The hospital moved for summary judgment.  In granting summary judgment in favor of the hospital, the court highlighted problems with the plaintiff's summary judgment evidence:

> At first blush, it would appear disputes of material fact clearly preclude summary judgment. After all, Juech disputes nearly all of Children's Hospital's proposed findings of fact. But her disputes are generally based upon empty rote objections, such as that the proposed fact is "immaterial, vague, and misleading." As to her own proposed facts, they are often derived from **her own deposition testimony, which itself is often inconsistent, marked by significant gaps in her memory, and sometimes not based upon personal knowledge**.[148]

The court rejected the notion that the hospital was required to provide an in-person interpreter at all times, finding that "it was not required to do so as long as it could provide effective alternative means of communicating" with the plaintiff.[149]  The court also noted that "written communication may be acceptable, especially for routine matters."[150]  The court also rejected the plaintiff's contention that complications with the VRI demonstrated discrimination:

---

[146] *Id.*
[147] *Id.* at 776.
[148] *Id.* at 779 (emphasis added).
[149] *Id.* (citing 28 C.F.R. § 36.303(c)(ii)).
[150] *Id.* (citing 28 C.F.R. § 36.303(b)(i)).
Document Number: 60489

The court also rejects Juech's implication that any temporary failure of or complication with the VRI amounts to discrimination. Technology is imperfect, and the Department of Justice undoubtedly appreciated as much when it adopted the relevant regulations approving VRI as a means for providing a qualified interpreter. Delays and difficulties in initiating the VRI do not necessarily amount to discrimination. In approving the use of friends or family to facilitate communication under certain circumstances when an interpreter is not available, the Department of Justice's regulations implicitly acknowledge that an interpreter might not be immediately available. *See* 28 C.F.R. § 36.303(c)(3), (4). Given that it could be expected that it might take some time for an interpreter to arrive at the location where her services are needed (*see* ECF No. 47-2 at 19 (Juech's testimony discussing the need to schedule interpreters a month or two weeks in advance because "it takes a while to set up interpreters" and "It's too hard to get an interpreter at the last minute"), a delay in obtaining and starting up the VRI does not necessarily constitute discrimination.

Nor does a finding of discrimination necessarily follow simply from the fact that a hospital tries to use an auxiliary aid that proves ineffective. For example, a hospital may attempt to communicate through written notes only to find that the issue being discussed is too complex for written notes. That does not, in hindsight, render the attempt discriminatory. Only if the hospital failed to provide an alternative auxiliary aid once it became clear that the initial method of communication was ineffective might there be a claim for discrimination.[151]

The plaintiff claimed that the hospital simply did not want to pay for a live interpreter, and the court found that this statement was "based entirely on impermissible hearsay."[152] The court explained:

[The plaintiff] recounts: "I asked for a live in-person interpreter and they brought the VRI and I said please bring in a live interpreter again, and they said that the hospital will not be paying for a live interpreter, so that I had to use the VRI, and I was continuously fighting for that, that an interpreter in person would be there." (ECF No. 47-1 at 11.) Asked how she knew this, she explained, "The nursing staff told my mother, and my mom interpreted to me and let me know that." *784 (ECF No. 47-1 at 11.) **Although Juech characterizes her mother as interpreting what the nursing staff said, she acknowledges that the statement was made to her mother, not to her. But the court was not presented with any testimony from Juech or her mother as to whether her mother was actually interpreting—that**

---

[151] *Id.* at 780.
[152] *Id.* at 783.
Document Number: 60489

**is, relating verbatim something medical staff told Juech (which would not be hearsay)—or simply relaying to Juech what she heard, perhaps with her own inferences and characterizations, which would make the statement hearsay. And the fact that Juech's mother is not fluent in sign language (ECF No. 47-1 at 18) certainly makes it less likely that the information Juech got from her mother was as a result of verbatim translation.[153]**

The court ultimately granted summary judgment in favor of the hospital, finding that, "the fact that Children's Hospital did not provide Juech with an in-person interpreter when she requested one does not, without more, suggest deliberate indifference."[154]

The same evidentiary problems addressed by the *Juech* court are present in the current case.  Much of Plaintiff's evidence is based on hearsay and not personal knowledge.  At first glance, it would appear that there are material facts in dispute such that summary judgment is improper.  However, considering that the bulk of Crosby's testimony is uncontroverted, the Court finds that OLOL is entitled to summary judgment in this case.  Accepting Plaintiff's testimony as true, and interpreting all inferences in his favor, the Court finds that the following facts are undisputed based on the admissible summary judgment evidence submitted in this case.

Plaintiff authorized Harris to communicate with hospital staff on his behalf.  Plaintiff admits that he heard and understood nothing directly from any hospital staff and that he relied only what Harris interpreted to him, despite the fact that Harris is not fluent in ASL and was so angry in the ER that security was called to calm him down.  Plaintiff believes an in-person interpreter should always been provided to deaf patients, and the lack of an

---

[153] *Id.* at 783-784.
[154] *Id.* at 784 (citing *Liese*, 701 F.3d at 343 ("[T]he simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights ....")).
Document Number: 60489

in-person interpreter is why he filed suit. [155]    Plaintiff did not attempt to communicate with hospital staff via any other means of communication.    Plaintiff does not know if Crosby offered VRI or if it was functional on July 1, 2017.    There is no summary judgment evidence as to whether the VRI was functional or not because it was refused by Harris.    Plaintiff indicated more than once that he was unsure of the truthfulness of what Harris was relaying to him.    Harris has not submitted a sworn statement or given testimony in this case.

Crosby's deposition testimony is consistent with the notes she placed in Plaintiff's chart following his ER visit.    Plaintiff offers no summary judgment evidence to contradict Crosby's testimony that Harris repeatedly and emphatically declined the offered accommodation of VRI.    Crosby's testimony that she advised Harris that she would ask for a live interpreter is likewise uncontroverted.

Plaintiff argues that his testimony and Montgomery's testimony should be accorded equal weight as Crosby's in this matter.    The Court agrees.    However, Plaintiff chose to provide 4 pages of Montgomery's 93-page deposition transcript.    Further, both Plaintiff's and Montgomery's testimony are rife with hearsay and unidentified actors.    Montgomery never encountered Crosby after she arrived at the hospital.    Montgomery has no knowledge of the communications between Crosby and Harris.    In the transcript excerpt submitted from Montgomery's deposition, Montgomery did not identify any person who allegedly told her that the VRI was not working.

---

[155] Rec. Doc. No. 44-5 at 71:5-8.
Document Number: 60489

The record also establishes that Plaintiff was seen for his injury quickly. Plaintiff's thumb laceration was treated without the need for stitches.[156] Plaintiff was discharged from the hospital in less than an hour, and he was released to return to work without restrictions.[157] As in *Rosario*, the Court must view the accommodations provided in the context of the medical circumstances. Given the swift treatment and discharge for what was obviously deemed a minor injury based on the treatment, it was not unreasonable for OLOL to attempt to utilize VRI or other forms of communication rather than wait to provide an interpreter. As set forth above, the law does not require an in-person interpreter on demand in any event, but certainly in this instance, Plaintiff was released before a live interpreter could have arrived at the hospital. Waiting for an in-person interpreter would have significantly delayed Plaintiff's treatment.

Applying the applicable legal standards to the undisputed facts established in this case, the Court finds that Plaintiff has failed to present sufficient summary judgment evidence from which a reasonable finder of fact could conclude that any conduct on the part of OLOL staff was "something more than" deliberately indifferent to Plaintiff's disability. Plaintiff has failed to present evidence that OLOL staff had actual notice that Plaintiff's rights were being violated. Further, based on uncontroverted facts, OLOL made good faith efforts to attempt to accommodate Plaintiff, which were refused by Plaintiff's partner, who he instructed to speak on his behalf. There is no evidence that OLOL made a "deliberate choice" to discriminate against the Plaintiff.

---

[156] The Court acknowledges that Plaintiff's testimony demonstrates that he was dissatisfied with the medical care he received for his injury; however, that is irrelevant to the question before the Court. Further, Plaintiff testified that he never suffered any infection or had further problems with this injury following his discharge.
[157] Rec. Doc. No. 44-3, p. 3.
Document Number: 60489

D.    **Entitlement to Injunctive Relief**

Plaintiff has also moved for injunctive relief, requesting that the Court order OLOL to implement various relief measures, including, *inter alia*, developing and implementing policies prohibiting future discrimination against deaf individuals, prohibiting the denial to deaf individuals their right to effective communication; requiring OLOL to provide ASL interpreters when requested; and posting proper notices of deaf patients' rights.[158]    OLOL moves for summary judgment on Plaintiff's claim for injunctive relief.

To establish Article III standing, a plaintiff must show: (1) an injury in fact that is concrete, particularized, and imminent, and is not conjectural or hypothetical; (2) a causal connection demonstrating that the injury is fairly traceable to the defendant's challenged actions; and (3) that it is likely—not simply speculative—that a favorable decision will redress the injury.[159]    The Fifth Circuit has explained that "a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that [the alleged barrier] actually affects his activities in some concrete way."[160]    Because the Court has found no injury in fact, Plaintiff is not entitled to injunctive relief.

---

[158] Rec. Doc. No. 1, pp. 15-16.
[159] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotation marks omitted).
[160] *Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011).
Document Number: 60489

III.    **CONCLUSION**

For the reasons set forth above, OLOL's *Motion for Summary Judgment*[161] is GRANTED. Plaintiff's claims are dismissed with prejudice.    The *Motion for Reconsideration*[162] and *Joint Motion to Continue Trial*[163] are hereby DENIED without prejudice as MOOT.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 15th day of June, 2020.

*Shelly D. Dick*
_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[161] Rec. Doc. No. 44.
[162] Rec. Doc. No. 61.
[163] Rec. Doc. No. 74.
Document Number: 60489